**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Allied Professionals, Inc.; CareMate Corporation; Caring Needs, Inc.; Front Line Care, Inc.; Help Personnel Network, Inc.; Heritage Health Service, LLC; Pro Medical Staffing, Inc.; Infinity Care Systems, Inc.; Clinicians on the Move, Inc.; Infinity Health Care, Inc. d/b/a/ Firstat Nursing Services; Kind Hearts, LLC; LovingCare Nursing & Home Care Services, Inc.; Metropolitan Preferred Care, Ltd.; Minnesota Professional Nursing Services, Inc. d/b/a MinnPro; North Star Nursing Temporary Associates, Inc.; Tom Kasera, a sole proprietor d/b/a Nursing Alliance; Quality Care Consulting, Inc.; Quality Touch Health Care, Inc.; Rostel Nursing Care, Inc.; Summit Healthcare Services Co.; The Nurse Connection, Inc.; Total Nursing Care Services, Inc.; Ultimate Work Connection, Inc.; First Choice Nursing Services, Inc.; Efficient Medical Services, Inc.; HealthStar Staffing, Inc.; Lifecycle Health Services, Inc.; Caring Touch Nurses, Inc.; Around the Clock Nursing Care, Inc.; Healthcare Options, Inc.; Twenty Four Hour Temporary Services, Inc.; Quest Nursing & Homecare Services, Inc.; Interim HealthCare, Inc.; First Resource Nursing Services, Inc.; Americare Staffing Services, Inc.; Angela Isenberger, an individual; and Kathy Upsher, an individual,

Plaintiffs,

v.

State of Minnesota, Jan Malcolm in her official capacity as Minnesota's Commissioner of Health, and Michael O'Keefe in his official capacity as Minnesota's Commissioner of Human Services,

Defendants.

Civil No. 01-1534 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

John Boyle, Esq., and Rich Ostlund, Esq., Anthony Ostlund & Baer, P.A., 90 South Seventh Street, Suite 3600, Minneapolis, MN 55402, appeared on behalf of Plaintiffs.

Kristen M. Olsen, Esq., and Suzette C. Schommer, Esq., Office of the Attorney General, 445 Minnesota Street, Suite 900, St. Paul, MN 55101-2127, and Ann Beimdiek Kinsella, Esq., Office of the Attorney General, 445 Minnesota Street, #1200, St. Paul, MN 55101-2130, appeared on behalf of Defendants.

---

FILED AUG 30 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on August 29, 2001, pursuant to Plaintiffs' motion for a temporary restraining order. For the reasons stated below, the Court grants Plaintiffs' motion.

## Background

This matter involves the State of Minnesota's regulation of nursing homes, specifically the terms and conditions of employment of registered nurses ("RNs"), licensed practical nurses ("LPNs"), and certified nurses' assistants ("CNAs"). Plaintiffs are all Supplemental Nursing Service Agencies ("SNSAs" or "nursing pools") and their employees (RNs, LPNs, and/or CNAs). A SNSA or nursing pool is an entity which provides or procures temporary nursing employees, in this case to state-licensed nursing homes.

In this litigation, Plaintiffs challenge the constitutionality of 2001 Minnesota Laws, First Special Session, ch.9, art. 7, entitled "Regulation of Supplemental Nursing Services Agencies" ("the Act"), which is scheduled to take effect on August 31, 2001. The Act was passed, according to the Defendants, to advance two primary policy objectives: (1) to reduce the costs associated with the operation of nursing homes by regulating the amount SNSAs may charge nursing homes for their own operating costs and the wages and benefits of their employees; and (2) to create parity between the wages offered by SNSAs and by nursing homes for permanent nursing staff, allowing the nursing homes to better compete for potential employees and thereby, according to the State, improve the quality of nursing care in nursing homes.[1]

---

[1] The Defendants allege that permanent nursing staff are able to provide higher quality care to nursing home residents because they have more constant placements that allow them to establish familiarity and rapport with nursing home residents.

The entire statute is rather lengthy, but those portions which are at issue in the litigation read as follows:

> [Sec. 2., ] Subd. 6. . . . Supplemental nursing services agency [] does not include any nursing service agency that is limited to providing temporary nursing personnel solely to one or more health care facilities owned or operated by the same person, firm, corporation, or partnership.
>
> * * *
> [Sec. 4.,] Subd. 1.
>
> * * *
>
> (3) the supplemental nursing services agency must not restrict in any manner the employment opportunities or its employees;
> (4) the supplemental nursing services agency, when supplying temporary employees to a health care facility, and when requested by the facility to do so, shall agree that at least 30 percent of the total personnel hours supplied are during night, holiday, or weekend shifts;
>
> * * *
>
> (6) the supplemental nursing services agency must not, in any contract with any employee or health care facility, require the payment of liquidated damages, employment fees, or other compensation should the employee be hired as a permanent employee of a health care facility.
>
> * * *
>
> [Subd. 2.,] Sec. 6. A supplemental nursing services agency must not bill or receive payments from a nursing home licensed under this chapter at a rate higher than 150 percent of the weighted average wage rate for the applicable employee classification for the geographic group to which the nursing home is assigned under Minnesota Rules, part 9549.0052. The weighted average wage rates must be determined by the commissioner of human services and reported to the commissioner of health on an annual basis. . . . The maximum rate must include all charges for administrative fees, contract fees, or other special charges in addition to the hourly rates for the temporary nursing pool personnel supplied to a nursing home.

Plaintiffs allege that these provisions of the statute violate the Due Process, Equal Protection, and Contract Clauses of the U.S. Constitution, and seek to enjoin implementation of the statute.[2]

**Discussion**

**A. Standard of Review**

In the Eighth Circuit, a temporary restraining order may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant will suffer irreparable harm absent the restraining order. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070 (1987). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**B. Likelihood of Success on the Merits**

Plaintiffs have alleged that the Act suffers from a variety of Constitutional infirmities. The record is not, at this point, developed well enough for the Court to make a determination about the merits of most of those claims. But two of the claims stand out to the Court as deserving of some discussion.

---

[2] Plaintiffs also allege that the Act violates comparable provisions of the Minnesota Constitution and the Minnesota Administrative Procedures Act. The State, however, has asserted that the Eleventh Amendment renders them immune from suit on those grounds in this Court. Because the Plaintiffs allege that the Federal Constitutional claims are the sole basis for their request for injunctive relief, the Court does not address the Eleventh Amendment issue.

First, the Court's decision to enjoin implementation of the law is based on the apparent merit of Plaintiffs' equal protection claim. Specifically, the Court is deeply troubled at the distinction the Act draws between independent SNSAs and so-called "captive" or "in-house" SNSAs–temporary pools of nursing staff which are maintained by individual nursing homes or groups of nursing homes owned by a single entity and which service only the nursing homes owned by the SNSAs parent entity.[3] The distinction drawn by the Act is certainly not a suspect, or even quasi-suspect, classification, and so it will withstand constitutional scrutiny so long as it is rationally related to some legitimate state interest. *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985). However, based upon the existing record, the Court believes that this classification will not pass constitutional muster even under this most deferential of standards.

The State defends the classification on the grounds that there is no evidence that these captive SNSAs contribute significantly to the rising costs of nursing home care, that the captive SNSAs engage in the "gouging" of which the independent SNSAs are accused. If the purpose of the legislation is to create parity in wages for both temporary and permanent nursing home staff, the classification does not advance that interest. The wages advertised by Beverly Healthcare are significantly above the weighted average wage rates, and approach the "allowable maximum supplemental nursing service charge" (150% of the weighted average wage rates). This is not

[3] For example, the Plaintiffs have submitted an employment advertisement from one such captive pool. Beverly Healthcare, an organization which operates 33 nursing home facilities around the state, has run an ad specifically aimed at employees of independent SNSAs who will be adversely effected by the current legislation ("Has the plug been pulled at your pool?"). The ad promises wages well above those that the nursing homes can pay their permanent employees, and offers a variety of benefits such as insurance, incentive pay, and shift differentials.

parity. Moreover, if the purpose of the legislation is simply to keep the costs charged to the nursing homes at a particular level, the classification does not advance that interest. Unless these captive SNSAs can operate with almost no overhead and can provide the substantial benefits promised at an astonishingly low cost, the wages promised in the ad indicate that at least this captive SNSA will charge the nursing homes more than the statutory maximum for its hourly employees. Finally, if the purpose of the Act is to encourage permanent employees to allow for continuity of care, the classification does not advance that interest. The Beverly Healthcare SNSA serves eleven nursing homes within the Twin Cities alone, and the employees will, ultimately, be temporary employees. There is no evidence in the record to suggest that these captive SNSAs will provide greater continuity of care than the independent SNSAs.

More importantly, the State's argument begs the question. The State says the classification is rational because these captive SNSAs do not need to be regulated. But the issue is not whether it is rational to regulate only the independent SNSAs but whether specifically exempting the captive SNSAs is rationally related to a legitimate government interest. The State has offered no legitimate government interest that is advanced by exempting the captive SNSAs, and the Court cannot see that one exists.

Second, although the Court's decision rests solely on the Plaintiffs' equal protection claim, the Court is also deeply troubled by the manner in which the Department of Human Services ("DHS") calculated the maximum allowable rates. At present, the Court has only the most vague description of how DHS arrived at the figures which are scheduled to go into effect; the record remains unclear about what, specifically, was averaged and what factor was used in

the weighting.[4] But the Court has been provided with an explanation of how DHS incorporated shift differentials into its calculation, and the process appears grievously flawed.

As described in the Affidavit of Robert Held, submitted after the hearing on this motion, DHS incorporated shift differentials in the following way. DHS started with the average wage differential for each type of shift (evening, night, or weekend) for each job group (RN, LPN, or CNA) as reported in a survey by the Minnesota Health and Housing Alliance (a trade association). Next, for each combination of shift and job group, DHS multiplied the average shift differential by the percentage of facilities paying any differential, and then multiplied that product by the percentage of all hours which qualify for that shift differential within that job category. The result was then added to the base weighted average wage rates.

The end result is that only between 0.0525% and 0.266% of each average wage differential was added onto the weighted average wage rates. Assuming that a particular SNSA provides employees only to nursing homes that provide shift differentials (and it would seem likely that such practices would be relatively uniform within a given community), and given that one third of the hours the SNSA schedules must be hours for which they pay a shift differential, providing an allowance of between 10 and 20 percent of the average shift differential will inadequately compensate those SNSAs for the wages they must pay. Perhaps DHS could argue that no method of calculation could be more precise or more fair given the constraints of the legislation, an argument which begs the question of the constitutionality or propriety of the

---

[4] For example, there are references in the brief descriptions to "classifications" of employees–apparently classifications other than RN, LPN, and CNA–but the Court cannot find any explanation of what these classifications are. The Court requests that DHS provide the Court with a more detailed, step-by-step explanation of the process, preferably by walking the Court through an example of the calculation, before any further hearing is had on the matter.

legislation itself. However, DHS has not, and likely cannot, explain its failure to distinguish between geographic regions–as required by the statute–in this portion of the weighted average wage rate calculation, except to point to the short amount of time DHS had in which to make these calculations. Lack of time, however, does not excuse constitutional requirements.

It is unclear on the record whether the problems with the method by which DHS calculated the maximum allowable charges rise to the level of due process violations. However, they are certainly troubling enough, when coupled with the more glaring equal protection issues raised by the Act, to warrant closer attention before the Act is allowed to be implemented. The Court hopes that these issues, and the others raised in the Complaint, can be more fully explored and briefed before any further hearing is had on the matter.

**C. Irreparable Harm**

The Plaintiffs have alleged that the maximum charge limits which the State will impose under the Act, coupled with the other constraints and obligations imposed by the Act, will force the Plaintiff SNSAs to offer their employees wages significantly lower than those currently being offered and, indeed, significantly lower than those being offered by the nursing homes to permanent employees. At a minimum, Plaintiff SNSAs will be unable to offer wages competitive with the "in-house" or "captive" pools maintained by the various entities owning one or more nursing homes. Plaintiffs have provided numerous affidavits which indicate that many of the Plaintiff SNSAs will be forced out of business entirely within, at most, a few months. Such harm would be irreparable because no money damages could adequately compensate these business owners–many of them individuals and families–for the loss of their business and the costs of recreating a business. Even if monetary compensation could be adequate, no such

monetary damages are available to these Plaintiffs in this Court because of the sovereign immunity issue.

What's more, the individual Plaintiffs are facing fairly serious reductions in wages if the law is implemented. According to the Plaintiffs' expert, most SNSAs bill nursing homes 150% of the wages they pay to their employees. If the SNSAs may only bill nursing homes for 150% of the weighted average wage rates, then it is to be expected that the SNSA employees will be paid roughly the weighted average wage rates.[5] While the loss of a few dollars an hour may not seem like a lot when compared to the enormous sums of money funneled through the State's fisc, or even compared to the sums of money expended on the nursing home industry as a whole, those few dollars an hour will have a dramatic effect on these employees. And, given the unavailability of monetary relief, those dollars lost are lost forever.

**D. Balance of Harms and Public Interest**

In this case, the balance of harms and the public interest are closely intertwined. What is the harm, or potential harm, that will come from imposing an injunction? According to the State, apart from the generalized harm of a delay in implementing the legislative will, the harm is the continued costs the nursing homes will incur in paying the rates demanded by the independent SNSAs, continued quality of care issues associated with a lack of permanent employees, and a continued labor shortage within the nursing home industry.

The Court is deeply sympathetic with the plight of the nursing homes. They are limited by law in the amount they can charge their residents for care, they are required by law to

[5] If the SNSAs cut back on benefits and reduce their own profit margin, they might be able to pay their employees a little more than those weighted average wage rates, but, at a minimum, the employees can expect fairly drastic cuts in their wages given that, at present, their hourly wages alone approach the maximum allowable charges under the Act.

maintain certain levels of staffing and services, and they are limited by law in their ability to compete in the labor market for full-time employees. It is uncontroverted that many nursing homes are just squeaking by, and some are operating at a substantial loss. However, there are any number of ways that the State could seek to alleviate that squeeze: by increasing the *per diem* for nursing home residents, by raising the currently "deplorably low" wage rates nursing homes can offer their permanent employees,[6] by regulating the amount that other health care industries (pharmaceutical companies, medical supplies providers, physicians, etc.) can charge to nursing homes. The State has chosen to limit nursing home costs by driving down the wages of nursing staff. That is the State's prerogative. But the people who work in this particular segment of the industry, those with the least ability to shoulder the responsibility,[7] must not have their rights compromised in the name of "solving" a problem of which they, or their wages, are only a small portion.

---

[6] Indeed, the Minnesota House Committee on Commerce, Jobs & Economic Development have recognized these first two options and indicated that they are preferable to the solution posed by the Act. The Act's sponsor, Representative Bradley, noted that "we essentially, by the rates we provide to nursing homes, pretty well establish what they can afford to pay for people." Committee Hearing on H.F. 1658, March 22, 2001. Representative Bradley clearly recognized that the low *per diem* rates paid to the nursing homes contribute to the inability of the nursing homes to compete for employees. In that same hearing, Representative Paymar noted that "frankly, the wages that [Minnesota] pay[s] nursing home staff are deplorably low and [the State] should do something about that . . . ." *Id.* The legislature chose, however, to forego these alternative measures in favor of the Act before us.

[7] The Court notes that the record strongly supports the Plaintiffs' contention that a disproportionate number of the nursing staff working for these SNSAs are women, single mothers, and minorities. For many of these people, employment as a certified nursing assistant or LPN represents the most lucrative employment available to them, and the flexibility of hours provided by the SNSAs is the only thing that enables women with children to engage in this type of work.

With respect to the issue of quality of care, again, that is something of which the Court is mindful. In all of the talk of economic impact, shift differentials, geographic groups, and wage caps, it is perhaps easy to forget that every party to this action, both named and unnamed, is fundamentally concerned with caring for our community's elderly and infirm. It is a serious responsibility and one that the Court considers in making its decision today. The State may well be right that permanent nursing home staff are better able to care for their residents than are temporary employees from the SNSAs. However, as discussed above, the record before the Court does not support the State's assumption that this legislation will actually increase the number of permanent nursing staff in nursing homes. First, the legislation exempts an entire class of temporary agencies, the scope of which is unclear. Second, there is no evidence before the Court which suggests that "permanent" nursing staff are really permanent in any meaningful sense; we have no notion of what the turn-over rate of the permanent staff is or how that will be effected by this legislation.

And, finally, with respect to both quality of care and the oft-cited "exodus" from the nursing care industry, there is absolutely no evidence that the nursing care workers who depart the failed SNSAs will become permanent nursing home employees. It seems more likely, and the affidavits provided by Plaintiffs confirm, that the effect of driving down wages for nursing home nursing staff will simply drive more people from the industry entirely.

The Court could expound at length about the wisdom of attempting to remedy the ills of the nursing care industry by driving down the wages of nursing staff to the "deplorably low" rate mandated by existing state law. However, it is not the Court's obligation to judge the wisdom of legislative solutions to social problems; even unwise solutions may pass constitutional muster under the deferential standard of review the Court must apply, and the Court may only inquire as

to the constitutionality of legislation. Moreover, and more importantly, the Court notes that the Act at issue here does not eliminate the disparity in wages for nursing staff; rather, the Act simply limits who is allowed to be on the winning end of that disparity. Public policy does not favor the Court allowing implementation of legislation which is likely unconstitutional, to the detriment of an entire class of businesses and laborers, which will simply allow another group of businesses to perpetuate the very problem the legislation seeks to remedy.

**E. Conclusion**

The Court finds that the Plaintiffs are likely to succeed on the merits of their equal protection claim, and the Court has significant other concerns about the constitutionality of the Act. Moreover, the Court finds that the Plaintiffs will suffer irreparable harm if the Act is implemented, and that the balance of harms and public policy favor an injunction. The Court is cognizant that this is an extreme remedy, and is guided in part by the understanding that this temporary restraining order will be of relatively short duration. The Court expects the parties to engage in some form of expedited discovery and to schedule a more comprehensive preliminary injunction hearing on the issues forthwith.

The Court does note further, however, that the Court's ultimate ability to craft a remedy is a blunt authority. Although the parties are obviously constrained by the terms of the existing legislation, it may well be in the interests of all concerned–the State, the SNSAs, the nursing homes, the nursing employees, and, most importantly, the nursing home residents–for the parties to agree to continue this Court's injunction (or stipulate to continue a modified version of this injunction) and to work together to attempt to craft a more viable and effective solution to the ills the Act sought to remedy. In the end, the parties and the legislature will be better able to find a solution to this clearly dire situation, a solution which is acceptable to all involved and which

operates within the limits imposed by the Constitution. If however, the parties are unwilling or unable to engage in this type of out-of-court negotiation, the Court will consider more fully the merits of Plaintiffs' claims in the near future.

For the reasons stated, **IT IS HEREBY ORDERED**:

1. Plaintiffs' Motion for Temporary Restraining Order (Doc. No. 2) is **GRANTED** as follows:

a. Defendants are hereby enjoined from administering and enforcing certain sections of 2001 Minnesota Laws, 1st Special Session, Chapter 9, Article 7 (entitled "Regulation of Supplemental Nursing Services Agencies), adopted by the Minnesota Legislature on June 29, 2001, and signed into law by Governor Jesse Ventura on June 30, 2001. Specifically, Defendants are enjoined from enforcing Section 2, subd. 6; Section 4, subd. 1(3), (4), and (6); and Section 6.

b. Plaintiffs are not required to post a bond.

2. Absent an agreement by the parties to continue this temporary restraining order in full force and effect, the parties shall contact the calendar clerk for the undersigned judge to schedule a preliminary injunction hearing in a timely fashion.

3. The parties shall contact the scheduling clerk of Magistrate Judge Arthur J. Boylan's to set up a scheduling conference pursuant to Rule 26(f) of the Federal Rules of Civil Procedure so that necessary discovery can be completed in a timely manner consistent with the preliminary injunction hearing date.

Dated: August 30, 2001

DONOVAN W. FRANK
Judge of United States District Court