**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Allied Professionals, Inc.; CareMate Corporation; Caring Needs, Inc.; Front Line Care, Inc.; Help Personnel Network, Inc.; Heritage Health Service, LLC; Pro Medical Staffing, Inc.; Infinity Care Systems, Inc.; Clinicians on the Move, Inc.; Infinity Health Care, Inc. d/b/a/ Firstat Nursing Services; Kind Hearts, LLC; LovingCare Nursing & Home Care Services, Inc.; Metropolitan Preferred Care, Ltd.; Minnesota Professional Nursing Services, Inc. d/b/a MinnPro; North Star Nursing Temporary Associates, Inc.; Tom Kasera, a sole proprietor d/b/a Nursing Alliance Quality Care Consulting, Inc.; Quality Touch Health Care, Inc. d/b/a Total Nursing Care Services; Rostel Nursing Care, Inc.; Summit Healthcare Services Co.; The Nurse Connection, Inc.; Total Nursing Care Services, Inc.; Ultimate Work Connection, Inc.; First Choice Nursing Services, Inc.; Efficient Medical Services, Inc.; HealthStar Staffing, Inc.; Lifecycle Health Services, Inc.; Caring Touch Nurses, Inc.; Around the Clock Nursing Care, Inc.; Healthcare Options, Inc.; Twenty Four Hour Temporary Services, Inc.; Quest Nursing & Homecare Services, Inc.; Interim HealthCare, Inc.; First Resource Nursing Services, Inc.; Americare Staffing Services, Inc.; Angela Isenberger, an individual; Kathy Upsher, an individual, and Care Network, Inc.,

Civil No. 01-1534 (DWF/AJB)

Plaintiffs,

**MEMORANDUM OPINION AND ORDER**

v.

Jan Malcolm in her official capacity as Minnesota's Commissioner of Health, and Michael O'Keefe in his official capacity as Minnesota's Commissioner of Human Services,

Defendants,

and

Union Coalition of Long-Term Care Workers; Advocacy Center for Long-Term Care; League of Women Voters of Minnesota; and Alzheimer's Association,

Movants.

NOV 21 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

John Boyle, Esq., and Rich Ostlund, Esq., Anthony Ostlund & Baer, P.A., 90 South Seventh Street, Suite 3600, Minneapolis, MN 55402, appeared on behalf of Plaintiffs.

Suzette C. Schommer, Esq., Ann Beimdiek Kinsella, Esq., and Frank Ling, Esq., Office of the Attorney General, 445 Minnesota Street, St. Paul, MN 55101-2130, appeared on behalf of Defendants.

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on November 16, 2001, pursuant to Plaintiffs' motion for a preliminary injunction. For the reasons stated below, the Plaintiffs' motion is granted in part and denied in part.

## Background

The factual basis for this litigation is set forth in greater detail in this Court's order granting Plaintiffs' motion for a temporary restraining order (Doc. No. 28). Basically, however, this matter involves the State of Minnesota's regulation of nursing homes, specifically the terms and conditions of employment of registered nurses ("RNs"), licensed practical nurses ("LPNs"), and certified nurses' assistants ("CNAs"). Plaintiffs are all Supplemental Nursing Service Agencies ("SNSAs" or "nursing pools") and their employees (RNs, LPNs, and/or CNAs). A SNSA or nursing pool is an entity which provides or procures temporary nursing employees, in this case to state-licensed nursing homes.

In this litigation, Plaintiffs challenge the constitutionality of 2001 Minnesota Laws, First Special Session, ch. 9, art. 7, entitled "Regulation of Supplemental Nursing Services Agencies" ("the Act"), which was scheduled to take effect on August 31, 2001. Plaintiffs challenge a number of provisions of the statute, both as written and as applied by the appropriate state agencies, on a variety of constitutional grounds.

First, with respect to Section 2, Subd. 6,[1] Plaintiffs argue that the exemption of so-called "captive" or "in-house" SNSAs from the definition of SNSAs violates Plaintiffs' equal protection rights. Second, with respect to Section 4, Subd. 1, paragraphs (3),[2] (4),[3] and (6),[4] Plaintiffs argue that the restrictions imposed on the SNSAs violate the Contract Clause. Third, with respect to Section 6,[5] Plaintiffs argue that the rate caps imposed, on their face and/or as applied, violate Plaintiffs' substantive due process rights. Finally, Plaintiffs assert that the manner in which the legislation was drafted and passed, without soliciting comment from the Plaintiffs, violates the Plaintiffs' procedural due process rights.

---

1 That provision provides, in part, that "[s]upplemental nursing services agency [] does not include any nursing service agency that is limited to providing temporary nursing personnel solely to one or more health care facilities owned or operated by the same person, firm, corporation, or partnership."

2 "[T]he supplemental nursing services agency must not restrict in any manner the employment opportunities or its employees."

3 "[T]he supplemental nursing services agency, when supplying temporary employees to a health care facility, and when requested by the facility to do so, shall agree that at least 30 percent of the total personnel hours supplied are during night, holiday, or weekend shifts."

4 "[T]he supplemental nursing services agency must not, in any contract with any employee or health care facility, require the payment of liquidated damages, employment fees, or other compensation should the employee be hired as a permanent employee of a health care facility."

5 "A supplemental nursing services agency must not bill or receive payments from a nursing home licensed under this chapter at a rate higher than 150 percent of the weighted average wage rate for the applicable employee classification for the geographic group to which the nursing home is assigned under Minnesota Rules, part 9549.0052. The weighted average wage rates must be determined by the commissioner of human services and reported to the commissioner of health on an annual basis. . . . The maximum rate must include all charges for administrative fees, contract fees, or other special charges in addition to the hourly rates for the temporary nursing pool personnel supplied to a nursing home."

On August 30, 2001, this Court granted Plaintiffs' request for a temporary restraining order. In that order, the Court concluded that Plaintiffs had a substantial likelihood of succeeding on the merits of their equal protection claim, that the Plaintiffs stood to endure irreparable harm if the statute were not enjoined, that the balance of harms favored an injunction, and that public policy weighed in favor of an injunction. The Court is now called upon to determine whether that injunction should be lifted or whether the Court should enter a preliminary injunction barring implementation of the statute.

## Discussion

### A. Standard of Review

As with a temporary restraining order, a preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant will suffer irreparable harm absent the restraining order. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070 (1987). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### B. Likelihood of Success on the Merits

In granting the Plaintiffs' motion for a temporary restraining order, the Court relied solely upon the Plaintiffs' equal protection claim. That claim appeared to have the most merit. In that regard, nothing has changed.

As noted in the earlier order, the distinction drawn between independent and captive SNSAs will withstand constitutional scrutiny so long as it is rationally related to some legitimate state interest; this is a very deferential standard. *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985). However, as noted in the earlier order, even under a rational basis review, the distinction drawn by the Act appears constitutionally infirm.

Defendants argue that the legislative distinction between independent and captive SNSAs is rational because these two types of agencies are not similarly situated. Specifically, Defendants assert that a variety of other regulations, beyond the Act, prevent nursing homes from recouping costs, for goods and services, paid to "related agencies" beyond the actual costs of those goods and services. In other words, to the extent that a nursing home obtains goods and services from a "related agency" (such as a captive SNSA), the nursing home can only seek reimbursement from the State for the costs of those goods and services, and not for profit or overhead. Moreover, Defendants note that the nursing home can only seek reimbursement for the costs of those goods and services if the costs are in line with what those goods and services would cost if obtained from an unrelated agency.

If, as Defendants argue, the purpose of the legislation is to keep the costs charged to the nursing homes at a particular level, the classification–even in light of the regulations cited by the Defendants–does not advance that interest. The regulations cited by the Defendants relate only to the reimbursement the nursing home may obtain from the state, *not* what the SNSAs may charge the nursing homes. Although the Defendants contend that there is no evidence, or even a real threat, that the captive SNSAs will charge the nursing homes for costs that the nursing homes cannot recover from the State–because to do so would be, figuratively, robbing Peter to

pay Paul–the bottom line is that there is no rational basis for carving out an exemption for the captive SNSAs.

Defendants argue that the law does not require the State to attack every aspect of a problem at the same time, that the law allows an incremental approach to public policy. That is true. However, the exemption for captive SNSAs does not reflect incremental public policy; the problem is not that the State has chosen only to regulate a single aspect of the industry, but that the State has chosen only to regulate a single aspect of the industry *as it applies to some businesses but not others*. In other words, while the law allows the State to focus exclusively on one small aspect of an issue, the law does not give the state license to discriminate between people or entities which are similarly situated with respect to that one small aspect of the issue.

Because the Court finds, on the record before it, that Section 2, Subd. 6, of the Act creates a discriminatory classification which is not rationally related to any legitimate government interest, the Court concludes that the Plaintiffs have a substantial likelihood of succeeding on the merits of their equal protection claim.

The same cannot be said, however, of Plaintiffs' other constitutional claims. First, and most notably, Plaintiffs' procedural due process claim is patently untenable. Plaintiffs assert that they were somehow excluded from the legislative process, not because they were deprived of the right to vote or the right to lobby, but because they were not consulted when the legislation was drafted. There is no constitutional right to be consulted when legislation which affects you is drafted. Plaintiffs seem to stretch the scope of procedural due process beyond all recognition.

Plaintiffs' other constitutional claims, based upon substantive due process and the Contract Clause, are more plausible but ultimately unlikely to succeed. Although the Court remains troubled by the method by which the maximum allowable rates were calculated, the

Court cannot say that the method amounts to a constitutional violation. Similarly, to the extent that Plaintiffs allege that certain provisions of the Act implicate the Contract Clause, those allegations appear tenuous at best.

**C. Irreparable Harm**

With respect to their equal protection claim, Plaintiffs assert that they will suffer irreparable harm if the Act is implemented because they will be unable to compete with the captive SNSA pools. The Court has addressed the irreparable harm issue before, in the order granting the Plaintiffs' request for a temporary restraining order, and that analysis has not changed.

**D. Balance of Harms and Public Interest**

The Defendants have identified a variety of harms which they–and the public at large–will endure if the Court continues to enjoin implementation of the Act: (1) the generalized harm of a delay in implementing the legislative will; (2) the continued high costs the nursing homes will incur in paying the rates demanded by the independent SNSAs; (3) continued quality of care issues associated with a lack of permanent employees; and (4) a continued labor shortage within the nursing home industry.

The Court finds that the majority of these harms are overcome if the Court limits its injunction to that portion of Section 2, Subd. 6, which exempts captive SNSAs from the definition of SNSAs. The Defendants have argued persuasively that, if the captive SNSA exemption is ultimately determined to be unconstitutional, the appropriate remedy will be to void the last sentence of Section 2, Subd. 6, while retaining the rest of the statute as written.[6] The

---

[6] The Court will not here undertake to recount the Defendants' argument, but rather (continued...)

Court agrees. Accordingly, the Court determines that the appropriate scope of the temporary injunctive relief should be limited to enjoining implementation of the last sentence of Section 2, Subd. 6.

The practical result of severing the constitutionally problematic language from the rest of the statute is that the various provisions of the Act will apply to both captive and independent SNSAs. To the extent that the legislation is intended to address cost, quality of care, and labor shortage issues, it will do so as well or better if the legislation is applied to both captive and independent SNSAs. Moreover, to the extent that Defendants have argued that the allegedly discriminatory classification is justified because the captive SNSAs are already similarly regulated by other laws and regulations, extension of the Act's provision to the captive SNSAs should have little *de facto* effect on the captive agencies themselves. Finally, although the application of the Act at all may have a detrimental effect on the Plaintiffs, application of the Act to the Plaintiffs and other similarly situated entities will cure the apparent equal protection problem.

**E. Conclusion**

Based upon the record before the Court, the Court concludes that the Plaintiffs are likely to succeed on their equal protection claim, but that the remainder of their constitutional claims are too tenuous to justify the extraordinary relief requested. Moreover, the Court concludes that it is appropriate to enjoin implementation of only the last sentence of Section 2, Subd. 6, severing that provision from the rest of the statute. Severing the constitutionally offensive provision does

---

[6](...continued)
cites the reader to pages 14 and 15 of the Defendants' brief in which the Defendants neatly lay out the applicable law on the issue of severability in Minnesota.

the least injury to the integrity of the legislative process; allows the legislative objectives of the Act to be achieved; and renders the Act constitutionally acceptable. Severing the provision is particularly appropriate at the preliminary injunction stage because, as Defendants note, the severance most closely mirrors the type of relief the Plaintiffs may expect to obtain from a trial on the merits of their equal protection claim. Accordingly, the Court orders that the Plaintiffs' motion for preliminary injunction is granted as to the last sentence of Section 2, Subd. 6, but denied in all other respects.

At this juncture, the Court feels compelled to comment again about the broader context in which this litigation arises and the postures adopted by the parties.

First, both parties have taken pains to portray themselves as David to their opponent's Goliath, as the underdog who is somehow more deserving of the Court's protection. In the end, the Court simply does not care who is the more powerful party and who is the weaker. The Court's role is to evaluate the positions of the parties as equals. Indeed, when the parties walk through the courthouse doors, they *are* equals in the eyes of the law.

Second, the Court notes that it is acutely aware of the crisis facing Minnesota nursing homes and the deplorable lack of quality long-term care for the elderly and disabled citizens of the State. As noted by several of the *amici*, addressing that lack of quality care should be a priority for the State. Whatever else may be said about the Act, at least it nominally attempts to address that issue.

However, the Court continues to harbor grave concerns about the tack the legislature has chosen to take: addressing the cost of providing long-term care by attempting to drive down the wages paid to nursing care staff. Most people would be surprised and appalled to learn that many CNAs–the staff members most directly responsible for the quality of care nursing home

residents receive–make the same or less per hour than do most high school kids working part-time retail jobs folding shirts or stacking cans. Providing care to nursing home residents is physically and emotionally demanding work, and it is deplorable that wage rates do not reflect either the difficulty or importance of this work. The Court continues to worry that the effect of this Act, of driving down wages for temporary employees rather than raising wages for permanent employees, will be to prompt a mass exodus of qualified care-providers from the nursing home industry.

Yet, while the Court may question the wisdom of the Act, it is not the Court's role to dictate how the legislature goes about its business. If the legislature chooses to address nursing home costs by capping wages for care-providers, so be it (so long as the legislature does not violate the Constitution in the process). The Court simply wishes to make it clear that, all editorializing aside, the Court's inquiry is and has been limited solely to the constitutional validity of the Act independent of its prudence as a matter of public policy

For the reasons stated, **IT IS HEREBY ORDERED:**

1. The Temporary Restraining Order dated August 30, 2001 (Doc. No. 28) is **VACATED**;

2. Plaintiffs' Motion for Preliminary Injunction (Doc. No. 61) is **GRANTED IN PART** as follows:

   a. Defendants are hereby enjoined from administering and enforcing certain Section 2, subd. 6, of 2001 Minnesota Laws, 1st Special Session, Chapter 9, Article 7 (entitled "Regulation of Supplemental Nursing Services Agencies), adopted by the Minnesota Legislature on June 29, 2001, and signed into law by Governor Jesse Ventura on June 30, 2001.

b. Plaintiffs are not required to post a bond.

3. Plaintiffs' Motion for Preliminary Injunction is in all other respects denied.

Dated: November 21, 2001

DONOVAN W. FRANK
Judge of United States District Court